**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| GEORGE WILLIS, as Trustee for the George and Kathleen Willis Trust, Derivatively on Behalf of Newmont Corporation,<br><br>Plaintiff,<br><br>v.<br><br>THOMAS R. PALMER, KARYN F. OVELMEN, NATASCHA VILJOEN, GREGORY H. BOYCE, BRUCE R. BROOK, JANE NELSON, JULIO M. QUINTANA, RENÉ MÉDORI, MAURA J. CLARK, SUSAN N. STORY, JOSÉ MANUEL MADERO, EMMA FITZGERALD, PHILIP AIKEN, and SALLY-ANNE LAYMAN,<br><br>Defendants,<br><br>and<br><br>NEWMONT CORPORATION, a Delaware Corporation,<br><br>Nominal Defendant.<br>. | No. 1:25-cv-00581-UNA |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff George Willis, as trustee for the George and Kathleen Willis Trust, brings this Verified Stockholder Derivative Complaint for the benefit of nominal defendant Newmont Corporation ("Newmont" or the "Company"), against certain of its current and former executive officers and members of the Company's Board of Directors (the "Board") for breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and violations of Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff which are

based on personal knowledge. This Complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1. This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant Newmont Corporation ("Newmont" or the "Company") against certain of its officers and directors for breach of fiduciary duty, unjust enrichment, and violations of law. These wrongs resulted in significant damages to Newmont's reputation, goodwill, and standing in the business community, as well as exposing the Company to potential liability for violations of state and federal law.

2. Newmont, headquartered in Colorado, is the world's leading gold mining company. While it primarily engages in gold production, Newmont also mines copper, silver, zinc, and lead. The Company operates elsewhere in the United States, Canada, Mexico, Dominican Republic, Peru, Suriname, Argentina, Chile, Australia, Papua New Guinea, Ecuador, Fiji, and Ghana. In November 2023, following a recent acquisition, Newmont significantly increased its portfolio and now operates more than half of the world's Tier 1 mines.[1]

3. The Individual Defendants (defined below) represented that the Company's expanded portfolio would lead to significant operational improvements, particularly in production and cost efficiency. Despite Newmont's increased capacity and resources, the Company

[1] Newmont defines Tier 1 mines as having, on average, over the life of the mine: (i) production of over 500,000 gold equivalent ounces per year on a consolidated basis; (ii) average All-In Sustaining Cost ("AISC") per ounce in the lower half of the industry cost curve; (iii) an expected mine life of over ten years; and (iv) operations in countries that are classified in the A and B rating ranges for Moody's, S&P, and Fitch.

encountered higher operating costs and production setbacks than the Individual Defendants represented to the public. Starting in February 2024, instead of promptly disclosing this material information to investors, Newmont's fiduciaries continued to assure the public that the Company remained on track to meet its mining and cost improvement objectives.

4. However, on October 23, 2024, Newmont revealed the truth in a press release, announcing that the Company had lowered its production guidance and reported a rise in operating costs. Following the press release, Newmont's stock plummeted more than 14.7%, or $8.49 per share, on October 24, 2024, to close at $49.25 per share compared to the previous trading day's closing of $57.74 per share.

5. The Individual Defendants repeatedly issued misleading public statements concerning Newmont's operations and prospects have devastated Newmont's credibility. As a result, the Company's market capitalization has fallen $30.1 billion, or 84.6%. Further, due to this this unlawful course of conduct, Newmont is now the subject of a federal securities class action lawsuit filed in the U.S. District Court for the District of Colorado on behalf of investors who purchased Newmont's shares, titled, *Karas v. Newmont Corp., et al.*, 1:25-cv-00341 (the "Securities Class Action").

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act over the claims asserted herein for violations of sections 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

8. This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

9. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

10. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

11. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

12. Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Newmont is incorporated in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Newmont, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

13. Plaintiff George Willis is the Trustee of the George and Kathleen Willis Trust (the "Trust"), which is a stockholder of Newmont at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Newmont stockholder. Plaintiff

is a resident of California and all Trust beneficiaries are residents of California.

14. Nominal Defendant Newmont is a Delaware corporation with principal executive offices located at 6900 East Layton Avenue, Denver, Colorado. Accordingly, Newmont is a citizen of Delaware and Colorado. Newmont is primarily a gold producer, which is also engaged in the production of copper, silver, lead, and zinc. The Company has significant operations or assets in the United States, Canada, Mexico, Dominican Republic, Peru, Suriname, Argentina, Chile, Australia, Papua New Guinea, Ecuador, Fiji, and Ghana. As of December 31, 2024, Newmont had 134.1 million ounces of proven and probable gold reserves, 99.4 million ounces of measured and indicated gold resources, 70.6 million ounces of inferred gold resources, and approximately 25,500 square miles of aggregate land position. The Company and its subsidiaries had approximately 22,200 employees as of December 31, 2024.

15. Defendant Thomas R. Palmer ("Palmer") has been Newmont's President since November 2018, and Chief Executive Officer and a director since October 2019. Defendant Palmer was also Newmont's Chief Operating Officer from May 2016 to June 2019; Executive Vice President from May 2016 to November 2018; Senior Vice President, Asia Pacific from February 2015 to May 2016; and Senior Vice President, Indonesia from March 2014 to February 2015. Defendant Palmer is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Palmer is a citizen of Colorado.

16. Defendant Karyn F. Ovelmen ("Ovelmen") has been Newmont's Executive Vice President and Chief Financial Officer since May 2023. Defendant Ovelmen is named as a defendant in the related Securities Class Action that alleges she violated sections 10(b) and 20(a) of the Exchange Act. Defendant Ovelmen is a citizen of Colorado.

17. Defendant Natascha Viljoen ("Viljoen") has been Newmont's Executive Vice

President and Chief Operating Officer since October 2023. Defendant Viljoen is named as a defendant in the related Securities Class Action that alleges she violated sections 10(b) and 20(a) of the Exchange Act. Defendant Viljoen is a citizen Colorado.

18. Defendant Gregory H. Boyce ("Boyce") has been Newmont's Independent Chair of the Board of Directors (the "Board") since April 2021 and a director since October 2015. Defendant Boyce is a citizen of Arizona.

19. Defendant Bruce R. Brook ("Brook") has been Newmont's Senior Independent Director since April 2021 and a director since October 2011. Defendant Brook has been the Chair and a member of Newmont's Audit Committee since at least March 2024. Defendant Brook is a citizen of Australia.

20. Defendant Jane Nelson ("Nelson") has been a Newmont director since October 2011. Defendant Nelson is a citizen of Massachusetts.

21. Defendant Julio M. Quintana ("Quintana") has been a Newmont director since October 2015. Defendant Quintana is a citizen of Texas.

22. Defendant Réne Médori ("Médori") has been a Newmont director since April 2018. Defendant Médori has been a member of Newmont's Audit Committee since at least March 2024. Upon information and belief, defendant Médori is a citizen of either France or the United Kingdom.

23. Defendant Maura J. Clark ("Clark") has been a Newmont director since April 2020. Defendant Clark has been a member of Newmont's Audit Committee since at least March 2024. Defendant Clark is a citizen of New York.

24. Defendant Susan N. Story ("Story") has been a Newmont director from September 2020 to April 2025. Defendant Story was a member of Newmont's Audit Committee in at least March 2024. Defendant Story is a citizen of Florida.

25. Defendant José Manuel Madero ("Madero") has been a Newmont director since April 2021. Defendant Madero is a citizen of Mexico.

26. Defendant Emma FitzGerald ("FitzGerald") has been a Newmont director since December 2021. Defendant FitzGerald is a citizen of the United Kingdom.

27. Defendant Philip Aiken ("Aiken") has been a Newmont director from November 2023 to April 2025. Defendant Aiken is a citizen of Australia.

28. Defendant Sally-Anne Layman ("Layman") has been a Newmont director since November 2023. Defendant Layman is a citizen of Australia.

29. The defendants identified in ¶¶15-17 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶15, 18-28 are referred to herein as the "Director Defendants." The defendants identified in ¶¶19, 22-24 are referred to herein as the "Audit Committee Defendants." Collectively, the defendants identified in ¶¶15-28 are referred to herein as the "Individual Defendants."

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

30. By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Newmont and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Newmont in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Newmont and not in furtherance of their personal interest or benefit.

31. To discharge their duties, the officers and directors of Newmont were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of

Newmont were required to, among other things:

(a) provide truthful and accurate information regarding Newmont's business operations and prospects;

(b) conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(c) remain informed as to how Newmont conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

32. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Newmont, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

33. The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to make false and misleading statements and omissions of materials facts that failed to disclose, *inter alia*, that: (i) the Company was not on track to achieve mining production and cost profile improvements; (ii) as a result, the Company provided inaccurate projections about its growth and business prospects; and (iii) the Company failed to maintain proper internal controls.

34. The Individual Defendants, because of their positions of control and authority as

officers and/or directors of Newmont, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such wrongful actions. As a result, and in addition to the damage the Company has already incurred, Newmont has expended, and will continue to expend, significant sums of money.

35. The Audit Committee Defendants, defendants Brook, Medori, Clark, and Story, owe and owed specific additional duties to Newmont pursuant to the Audit Committee Charter, in effect since February 17, 2017. As set forth in the Audit Committee Charter, among other things, the Audit Committee is responsible for assisting the Board in overseeing "the integrity of the Corporation's financial statements, the Corporation's compliance with legal and regulatory requirements, and corporate policies and controls." The Audit Committee Defendants were specifically required to perform, *inter alia*, the following:

> Review with management and the independent public accounting firm the accounting and reporting principles and practices applied by the Corporation in preparing its financial statements, including: (i) major issues regarding accounting principles and financial statement presentations including any significant changes in the Corporation's selection or application of accounting principles, and major issues as to the adequacy of the Corporation's internal controls and any special audit steps adopted in light of material control deficiencies; (ii) analyses prepared by management and/or the independent public accounting firm setting forth significant financial reporting issues, estimates and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; (iii) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Corporation; and (iv) earnings press releases (paying particular attention to any use of "pro forma" or "adjusted" non-GAAP information), as well as financial information and earnings guidance provided to analysts and rating agencies.

* * *

> Prior to the release of each quarterly and annual earnings news release, discuss with management and the independent public accounting firm the results for the quarter or the year, including any significant transactions which occurred during the quarter or the year, any significant adjustments, management judgments and accounting

estimates, new accounting policies and any disagreements between management and the independent public accounting firm.

## SUBSTANTIVE ALLEGATIONS

### Newmont Overpromises on Its Tier 1 Facilities

36. On November 6, 2023, Newmont acquired Newcrest Mining Limited ("Newcrest"), a public Australian mining company. As a result, Newmont gained control of more than half of the world's Tier 1 mines. As the leading gold producer, the Company is now responsible for "approximately five percent of estimated total worldwide mined gold production."

37. By highlighting the Company's expanded capacity and portfolio, the Individual Defendants convinced the public that the acquisition would substantially enhance its operational performance. Beginning in February 2024, despite facing significant challenges, the Individual Defendants repeatedly assured the public that the Company was still on track to meet its promises to achieve mining and cost improvements.

38. Although gold prices reached record highs in 2024, Newmont struggled to capitalize on profits due to difficulties controlling its mining costs. Furthermore, the Company encountered setbacks in achieving consistent production at two of its Tier 1 facilities.

39. Rather than alerting investors that Newmont was unlikely to meet its commitments to consistent production and cost reductions at its Tier 1 facilities, the Individual Defendants issued a series of false and misleading statements, misrepresenting that the Company remained on track to achieve these objectives.

### The Individual Defendants Misled the Public with False Assurances Concerning Improvements In Production And Cost Efficiency

40. Between February 22, 2024 and July 24, 2024, the Individual Defendants made a series of materially false and misleading statements concerning Newmont's ability to deliver

increased gold production, while lowering overall costs throughout its mining operations at its Tier 1 facilities.

41. In particular, on February 22, 2024, Newmont issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2023. The press release reported the following results:

- Completed the acquisition of Newcrest Mining Limited on November 6, 2023, creating the world's leading gold company with robust copper optionality

- Delivered $1.4 billion in dividends to shareholders in 2023

- Produced 5.5 million gold ounces and 891 thousand gold equivalent ounces (GEOs)[[2]] from copper, silver, lead and zinc; in-line with revised guidance range and incorporating the legacy Newcrest assets from the acquisition close date

- Reported gold Costs Applicable to Sales (CAS)[[3]] per ounce of $1,050 and gold All-In Sustaining Costs (AISC)[[4]] per ounce of $1,444; in-line with revised guidance range and incorporating higher sustaining capital spend for 2023

- Generated $2.8 billion of cash from continuing operations and reported $88 million in Free Cash Flow after unfavorable working capital changes of $513 million and $2.7 billion of reinvestment to sustain current operations and advance near-term projects

- Reported Net Loss of $2.5 billion driven by $1.9 billion in impairment charges, $1.5 billion in reclamation charges and $464 million in Newcrest transaction and integration costs; these items are excluded from adjusted earnings results

- Adjusted Net Income (ANI) of $1.61 per share and Adjusted EBITDA of $4.2 billion for the full year; fourth quarter ANI was $0.50 per share

---

[2] GEO refers to gold equivalent ounces.
[3] CAS refers to consolidated Costs Applicable to Sales.
[4] According to Newmont, "AISC is a metric that expands on GAAP measures, such as cost of goods sold, and non-GAAP measures, such as costs applicable to sales per ounce, to provide visibility into the economics of our mining operations related to expenditures, operating performance and the ability to generate cash flow from our continuing operations.

- Declared increased total Newmont reserves of 136 million gold ounces and resources of 174 million gold ounces; significant upside to other metals, including copper, silver, lead and zinc

42. Regarding the Company's 2024 guidance for mining production and costs, the press release stated:

> Newmont's 2024 outlook is supported by steady production from Newmont's managed Tier 1 and Emerging Tier 1 assets, and is further enhanced by the Company's ownership in the Nevada Gold Mines and Pueblo Viejo joint ventures. These assets form the core of Newmont's 2024 attributable production outlook for the Tier 1 Portfolio of approximately 5.6 million ounces. Total Newmont gold production is expected to be 6.9 million ounces, incorporating the incremental 1.3 million ounces from the six non-core assets.
>
> Costs in 2024 are expected to remain in line with 2023, with CAS of approximately of $1,000 per ounce for the Tier 1 Portfolio. AISC for the Tier 1 Portfolio is expected to be approximately $1,300 per ounce in 2024, incorporating higher sustaining capital spend compared to the prior year.

43. The press release also quoted defendant Palmer assuring investors that the Company was on track to deliver significant operational improvements at its Tier 1 facilities. In particular, defendant Palmer stated:

> With the acquisition of Newcrest now complete, our principal focus for 2024 is to integrate and transform our leading portfolio of Tier 1 assets into a unique collection of the world's best gold and copper operations and projects. With ***stable production and structured reinvestment throughout the year, we are strongly positioned to deliver on our commitments in 2024 and set the stage for meaningful growth in 2025 and beyond.***

44. The same day, Newmont held an earnings call with analysts and investors to discuss its financial results. During the call, defendant Palmer explained the justification behind Newmont's 2024 guidance. In particular, defendant Palmer stated:

> When we announced our binding agreement to acquire Newcrest in May last year, we outlined a powerful value proposition built around 4 key commitments. First, to set the new sustainability standard and strengthened Newmont's position as the gold sector recognize sustainability leader.

> Second, to create the industry's strongest portfolio of world-class gold and copper assets in the most favorable mining jurisdictions. Third, to deliver $500 million of annual synergies and realize over $2 billion in cash from portfolio optimization. And finally, to continue driving a disciplined, balanced approach to capital allocation.
>
> After closing the transaction on November 6 last year, the integration of the 5 new operations into our Newmont operating model has been progressing very well. And as we enter this critically important year of integration and transformation, ***I'll be holding myself and my executive leadership team accountable for delivering on these commitments and this will be our key focus in 2024***.

45. During the call, defendant Palmer also outlined the Company's plans to enhance operational performance, which include significant cost reductions and productivity gains across its Tier 1 portfolio.

> To support this work, earlier today, we announced 4 key actions that together will enhance our ability to deliver on our clear and consistent strategy. First, we plan to divest 6 high-quality but noncore assets this year. From this point forward, our world-class portfolio will consist entirely of Tier 1, an emerging Tier 1 operations and districts. And it will have a significant exposure to growth in copper and gold from our industry-leading organic project pipeline. Second, we provided our 2024 and 5-year outlook, getting a clear picture of the work we're doing today to expand margins and appropriately sequence our projects to deliver sustainable value.
>
> Third, with the clarity, simplicity and focus that our Tier 1 portfolio provides, ***we have committed to deliver a further $500 million in cost and productivity improvements across the entire portfolio. And these improvements are over and above our synergy commitment from the Newcrest acquisition. We expect to hit this $500 million annual run rate of improvement by the end of 2025***. And finally, we announced a balanced shareholder return framework, consisting of $1 per share annualized base dividend and a new $1 billion share repurchase program.
>
> Our go-forward Newmont portfolio is focused on Tier 1, gold and copper, operations and projects located in the world's most favorable mining jurisdictions. And it has 4 key features. First, it contains 10 Tier 1 operations, representing all the half of the world Tier 1 guidelines in the Newmont portfolio. Second, it has 3 emerging Tier 1 operations that each has a clear path for growth. And we have the opportunity to create a Tier 1 district in British Columbia, a district in which Newmont will be operating for at least the next century. And third, it has an unmatched organic development pipeline with 6 large-scale top of gold projects.

> And fourth, underpinning our Tier 1 portfolio, is the industry's most robust foundation of reserves and resources.
>
> Going forward, Newmont has the industry's largest gold resource base and we also have the largest base of copper resources in the gold industry. To put these numbers into perspective, Newmont has an almost 30% large gold reserve resource base than our nearest peer. And we have a 40% larger copper reserve resource base than our nearest gold peer. No other gold producing in the world can offer the depth and quality that Newmont's Tier 1 portfolio can today.

46. Later in the call, defendant Palmer reiterated his previous claims regarding the cost and productivity improvements across Newmont's Tier 1 portfolio, praising the purported value provided by the Company's Tier 1 facilities. In particular, defendant Palmer stated:

> ***As I mentioned earlier, with a clear line of sight into the Tier 1 managed operations in our portfolio, we have identified $500 million of additional cost and productivity improvements over and above our synergy commitments***. So taking everything into account, over the next 5 years, ***we expect to deliver growing gold production*** driven by the completion of laybacks at both Boddington and Penasquito, the new ounces from Ahafo North, the completion of the second expansion at Tanami, at both block caves at Cadia, ***and mining improvements combined with higher grades at Lihir***.
>
> And on top of this improving gold production, Newmont will produce a significant amount of copper along with silver, lead, zinc and molybdenum from a global, diversified Tier 1 portfolio. ***Driven by this high metal production and with a focus on improving costs, we expect to deliver all-in sustaining costs bringing our go-forward portfolio down to $1,150 per ounce by 2027***.
>
> Newmont's go forward Tier 1 portfolio sets the new standard for gold and copper mining and provides our shareholders with exposure to the highest concentration of Tier 1 assets in the sector, located in the most favorable mining jurisdictions, and with improving cost profile to maximize margins and generate strong free cash flow. The industry-leading growth optionality in copper and gold through disciplined reinvestment and project execution and a balanced shareholder return framework.

47. Towards the close of the call, defendant Viljoen highlighted Newmont's restructured project delivery team, which was purportedly focused on achieving the Company's operational improvement targets. In particular, defendant Viljoen stated:

> To support our operations from the project execution side, we have a dedicated

> restructured project delivery team. This team of subject matter experts is working across the full spectrum of our organic pipeline, including studies, project development, construction and commissioning of projects. They strengthen our operating model with Block Caving capability and an understanding of industry-leading practices in project development.
>
> This year, we will have a laser focus on the performance of our 11 managed operations in our go-forward portfolio, while also guiding our 6 noncore assets through a safe and productive process for divestment. ***As we work to deliver efficiency and reliability from our global portfolio, we are committed to progressing our 4 key projects in execution and keeping them on track in 2024***.

48. During the question-and-answer portion of the call, an analyst asked defendant Palmer to elaborate on its five-year guidance and whether any key assumptions may shift. In response, defendant Palmer stated that investments in key projects will drive higher production and lower costs. In particular, defendant Palmer stated:

> What you're seeing in the production and cost profile is just that go forward Tier 1 portfolio. So it does not include the six assets held for divestment. It does include the ounces that start to come through from the investments that we're making, those four projects that we talked about. So it's seeing ounces come through in that time frame from the two Block Caves at Cadia, a shaft at Tanami and Ahafo North.
>
> And a significant proportion of that $1.3 billion of development capital in that time frame is about funding those four projects in execution. As we think towards the end of that five years, we certainly have started to see the spend on those projects drop off, and it's going to be around about that time frame that we're starting to think about what's that next cab off the rank in terms of projects that would maintain that average of $1.3 billion.
>
> But the vast majority of what you see in that five year profile, particularly the cost profile, the all in sustaining cost profile and the gold production profile is the existing operations moving through different phases of the mine cycle. ***We're getting to higher grades and that investment paying off in terms of additional ounces and better grades***.

49. On April 25, 2024, Newmont issued a press release announcing its financial results for the first quarter ended March 31, 2024. The press release assured investors that Newmont was "[f]irmly on track to deliver 2024 guidance for product, costs and capital spend." The press release

also quoted defendant Palmer praising Newmont's strong quarterly performance, attributing the results to its Tier 1 facilities. In particular, defendant Palmer stated:

> Newmont delivered a strong first quarter operational performance, producing 2.2 million gold equivalent ounces and generating over $1.4 billion in cash from operations before working capital changes. … ***Underpinned by the gold industry's leading portfolio of Tier 1 gold and copper operations, we remain well-positioned to achieve our full-year guidance and deliver meaningful synergies and productivity improvements from the combined portfolio***. We remain focused on delivering on the commitments we laid out at the beginning of this year, creating an attractive value proposition for new and existing investors during this unique time in the gold industry.

50. That same day, Newmont held an earnings call with analysts and investors to discuss its financial results. During the call, defendant Palmer once again assured investors that the Company was on track to reach its 2024 guidance figures and achieve both cost and production improvements. In particular, defendant Palmer stated:

> Turning to our quarterly results, ***we are firmly on track to deliver our 2024 guidance***. We are pleased with our operational performance in the first quarter and ***remain focused on delivering consistent results as guided over the remainder of this year and beyond***. also want to reiterate the 4 key commitments that we have made to our shareholders. We continue to make progress on these commitments, and I'd like to provide a brief update on our first quarter achievements.
>
> Starting, we're strengthening Newmont's position as the gold industry's recognized sustainability leader. Last week, Newmont published their 20th Annual Sustainability Report along with our third annual taxes and royalties contribution report, both providing a detailed and transparent look at our values-driven approach to sustainability, and the economic contributions we made in the jurisdictions and communities that we operate in. With this sustainable foundation in place, we have created the industry's strongest portfolio of world-class gold and copper assets in the most favorable mining jurisdictions.
>
> And from this portfolio, we produced 1.7 million ounces of gold at an all-in sustaining cost of $1,439 an ounce in the first quarter. ***We continue to expect these unit costs to improve throughout the year, driven by both higher production*** in the second half and the delivery of synergies. I'd also note that in the first quarter, our go forward Tier 1 portfolio produced 1.4 million ounces of gold at $1,378 an ounce.
>
> Our Tier 1 portfolio also produced over 480,000 gold equivalent ounces from

> copper, silver, lead and zinc and included in this number is the 35,000 tonnes of copper that we produced and sold. We generated $776 million of cash flow from operating activities in Q1, including a $666 million reduction from working capital which Karyn will cover in a few minutes.
>
> And when we exclude the $291 million onetime stamp duty payment we made in February in connection with our acquisition of Newcrest free cash flow for the quarter would have been $217 million. Our second quarter production and costs are expected to remain relatively consistent with the first quarter. And we continue to expect that our gold production will be weighted to around 53% in the second half of the year, ***remaining firmly on track to achieve our full year guidance on both production and cost basis***.

51. During the call, defendant Palmer elaborated on Newmont's purported plans and initiatives that have been implemented to meet its guidance. In particular, defendant Palmer stated:

> ***We remain firmly on track to deliver on our commitments***. In the first quarter, we achieved $56 million in synergies, bringing the total delivered to $105 million since we closed our acquisition of Newcrest in November last year and building solid momentum towards our commitment of delivering a $500 million synergy run rate by the first of January 2026.
>
> ***We have identified a series of initiatives, each with action plans and dedicated resources in place that have us on track to achieve a $335 million run rate by the end of this year***, representing 2/3 of our $500 million synergy commitment and well ahead of the run rate we estimated when we announced this commitment in May of last year. Beginning with the core of this value delivery, we are seeing great opportunities emerging from our full potential work and we are just getting started.
>
> At Lihir, we recently completed the first phase of full potential from which we have identified initiatives that will deliver more than $150 million of value close to double the synergy target we allocated to this new Tier 1 operation in our portfolio. I've just returned from Lihir and the key to extracting this value will be simplification. Following a very similar approach to the 1 we used at Penasquito 5 years ago. We have key members of our Newmont technical team on the ground in P&G supporting the site team to work on simplifying operations by focusing on the areas that would genuinely move the needle and stopping the non-value activities that have historically played this operation.

52. Defendant Palmer also highlighted the Company's General and Administrative ("G&A") synergies that will supposedly result in significant cost and production improvements, stating:

> Then turning to G&A. We have already achieved over 80% of the synergies that we committed to and we expect to exceed our $100 million G&A commitment by the end of this year. Most of our G&A synergies are coming from employee and contractor rationalization as we expected and to a lesser extent, from reductions in insurance premiums and other administrative fees. ***We look forward to realizing the significant production and cost benefits*** from our synergy work and we will continue to provide you with updates on our progress each quarter.

53. Later in the call, defendant Ovelmen further assured investors that Newmont was on track to achieve its full year guidance for production and costs. In particular, defendant Ovelmen stated:

> And with production also weighted toward the second half of the year, we anticipate that the majority of our cash flow after working capital will be realized in the third and fourth quarter, ***positioning Newmont for a stronger second half of the year from both an earnings and cash flow perspective as we continue to focus on operational delivery. As Tom mentioned, we remain firmly on track to achieve our full year guidance for production, costs and capital spend***.
>
> ***Production is expected to increase in the second half of the year. With the year's strongest performance anticipated in the fourth quarter, primarily driven by strong grades at Penasquito, and Tanami. And unit costs will be closely correlated to production with the added benefit of full potential improvements and additional synergies realized in the second half of the year***.

54. On July 24, 2024, Newmont issued a press release announcing its financial results for the second quarter ended June 30, 2024. Just nearly three months before the truth was revealed, Newmont continued to represent that it was on track to achieve its 2024 guidance for production and costs. The press release quoted defendant Palmer providing assurances that Newmont would achieve its full year guidance. In particular, defendant Palmer stated:

> Newmont delivered a solid second quarter, producing 2.1 million gold equivalent ounces and generating $594 million in free cash flow. … We continued to advance our divestiture program and, to date, have announced $527 million in proceeds this year. As we head into the second half of the year, ***we remain confident in our ability to continue executing on shareholder returns, meet our full year guidance and deliver on our commitments***.

55. That same day, Newmont held its earnings call with analysts and investors to

discuss its financial results. During the call, defendant Palmer praised the Company's synergy delivery from the Newcrest acquisition, claiming that Newmont was on track to surpass its original synergy goal. In particular, defendant Palmer stated:

> Turning now to synergies. ***We remain firmly on track to deliver above and beyond our initial commitment of $500 million***. In the second quarter, we achieved $100 million in synergies, bringing our run rate to $205 million since we closed our acquisition of New Crest only 8 months ago. With this solid momentum, we have now disbanded our back-office integration team and remain firmly on track to achieve a $335 million run rate by the end of this year, well ahead of our initial estimates.
>
> Looking at the 3 components of our synergy delivery, and starting with full potential. We are now advancing into the delivery stage of the initiatives we have identified at Lihir, Cadia and Red Chris, with the largest value drivers coming from our 2 new Tier 1 assets in Lihir and Cadia. On our call last quarter, we provided an update on the opportunities we have identified at Lihir. In this quarter, I'll briefly describe some of the opportunities we see in front of us at Cadia. We recently completed our full potential diagnosis phase at Cadia, from which we have identified a series of initiatives that are expected to deliver more than $100 million of value by the end of next year.

56. During the call, defendant Palmer also emphasized Newmont's focus on improving production efficiency across its key facilities. In particular, defendant Palmer stated:

> During this first phase, we had a team of experts from Newmont's Global Technical Services group working to support the site to identify opportunities to higher production and improve cash flows. As one example of this, and through collaboration with Boddington, Cadia is working to optimize the output from its high-pressure riding roll circuit in the mill. With these HPGR improvements, Cadia will be able to lift its mill feed by approximately 80 tonnes an hour or more than 600,000 tonnes a year, implementing the initiatives we have identified and leveraging the experience we have gained over the last 10 years with our Full Potential program.
>
> We are working with the team at Cadia to increase average mill throughput to 34 million tonnes per annum representing a meaningful step up in productivity from this world-class gold and copper asset. With Lihir, Cadia and Red Chris all now entering the delivery phase of full potential, we are on track to meet our initial $200 million commitment.

57. Defendant Palmer also assured investors that the Company's G&A and supply chain

synergies would reduce unit costs in the second half of the year. In particular, defendant Palmer stated:

> Turning to supply chain synergies. We continue to leverage our combined scale to drive improved commercial outcomes for both pricing and terms. In the second quarter, we realized $60 million in synergies from around 40 initiatives in contracted services, mining equipment, energy, information technology among other categories. And we have a clear line of sight to reach $140 million run rate by the end of this year as we progress our commercial work across several spend categories, including chemicals, explosives, grinding media, ties, fuel, as well as spare parts and rotables.
>
> And finally, turning to G&A synergies. We have now achieved 95% of our initial $100 million commitment with an additional $15 million realized during the second quarter. The latest G&A synergies have primarily been coming from continued labor rationalization and ongoing reductions in our contractor spend***. Taking these synergies into account, combined with the higher production volumes anticipated in the second half of this year, we expect to deliver lower unit costs in the third and fourth quarters.***

58. Also, during the call, defendant Ovelmen once again reassured investors that the Company was on track to achieve its full year guidance for cost and production would continue to ramp up for the remainder of 2024. In particular, defendant Ovelmen stated:

> And whilst we are pleased with the improvement in free cash flow, we are still not satisfied and are working to further improve margins. Looking ahead, we anticipate higher free cash flows in the second half of the year driven by increased production values and lower unit costs, as Tom and Natascha just mentioned. ***Heading into the second half of the year, we remain firmly on track to achieve our full year guidance of reduction, cost and capital spend***. And as Natascha mentioned, ***production is expected to increase in the third quarter, with the year's strongest performance anticipated in the fourth quarter.***
>
> ***Unit cost will be closely correlated to production with the added benefit of full potential improvements and additional synergies realized in the latter part of the year***. Today, we announced 2 divestments, including the monetization of our Batu Hijau deferred payment obligations and the sale of our Lundin Gold financing facilities. In total, these divestitures are expected to generate nearly $530 million in gross proceeds by the end of the year. With this momentum, the benefit of higher commodity prices contributing to enhanced free cash flows and the confidence in our asset divestiture program, we were able to prioritize shareholder returns sooner than anticipated while concurrently executing on debt reductions.

59. Defendant Palmer also provided assurances about the Company achieving higher products and lowered costs to finish 2024. In particular, defendant Palmer stated:

> First and most importantly, we commenced a systematic review of our safety and risk management systems. We safely delivered solid production as planned, ***keeping us firmly on track to meet our full year guidance for both ounces and costs***. We announced meaningful progress on our portfolio optimization commitments with the monetization of our Batu Hijau deferred payment obligations. We realized $100 million in synergies, bringing the total delivered to $205 million since we closed our acquisition of Newcrest in November last year. We've demonstrated our commitment to shareholder returns, delivering $540 million through both regular dividends and share repurchases. And we strengthened our balance sheet with $250 million of debt reduction.
>
> As we enter the second half of this year***, I am confident in our ability to deliver high production, more potential improvements and additional synergies, all of which will contribute to lower unit costs in the third and fourth quarters***, and execute on our portfolio optimization strategy through the divestment of our non-core assets, and to progress our capital allocation priorities, ***all positioning Newmont for a strong finish to this year***.

60. During the question-and-answer portion of the call, an analyst sought clarification on how Newmont expected to achieve its guidance, given recent production volume and synergy figures. In response, defendant Palmer affirmed that the Company would meet its guidance with favorable performance in the second half of the year. In particular, defendant Palmer stated:

> You certainly got to see the synergies getting through -- particularly those coming from full potential in the fourth quarter as those programs get their momentum up. ***You're certainly going to see the highest quarter 4 gold ounces in the fourth quarter***. That's from some of our key assets that Natascha covered in her comments. The 2 nonmanaged joint ventures, so NGM need to deliver on their commitments and they've got that strong fourth quarter.
>
> Our direct costs are pretty stable across the year. And certainly what we're seeing in the first half flowing through the second half, pretty stable. So I think the picture you're painting in terms of that third quarter weighting to the fourth quarter weighting is a reasonable position to be thinking about in terms of that weight between the third and the fourth quarter. ***You will see a step up in the third and then a step up into the fourth to get to our numbers***.

61. In response to the analyst's follow-up question seeking clarity on the composition

of Newmont's reported synergies, defendant Palmer claimed that while G&A synergies had already been realized, the Company was expecting further savings from supply chain synergies. In particular, defendant Palmer stated:

> Certainly, when you think about G&A, and it's the same we saw for Goldcorp, similar size companies, that's around about the mark. So we've largely seen that come through. Still pushing hard on -- we've got a strong commercial team working hard on all those fronts. So you're going to see a good amount come from that supply chain work. And then you'll start to see both Lihir and Cadia bit of regress in the fourth quarter. So not much from G&A to percentage coming from supply chain as that work started to kick in. And then you'll start to see in the fourth quarter some of the full potential of the operation starting to kick through, really, they start to show up in 2025. But again, the split, you're actually [indiscernible] not too far off the mark.

62. On September 17, 2024, during Newmont's presentation at the Denver Gold Forum, defendants Ovelmen and Viljoen continued to praise the Company's Tier 1 facilities. Just a month before the truth emerged, defendants Ovelmen and Viljoen continued to conceal the Company's operational challenges. In particular, defendant Ovelmen stated:

> If we consider the portfolio of assets we have today, it is a real suite of Tier 1 assets, with a total embarrassment of riches when we think about our project portfolio. The reality for us and the opportunity lies in operational excellence, technical expertise and the discipline to deliver against good, developed plans, with an eye on the future. And if you consider where we are in the gold industry and what the trajectory is that we see the gold sector will go into, continuously planning and designing our mines with a long-term in mind.
>
> And with 11 Tier 1 assets, soon to be 12 when we start up our Ahafo North project, we have a true opportunity to look at the enterprise and run these operations really, really well. And the one lesson I've learned, and is actually something that my father told me when I started my career, and when you talk about people like Mark and Amar in the room, is that we need to go back and learn what really good basic practice in mining is. We need to know our assets really well and we need to drive that basic good practice in mining.

63. During the question-and-answer portion of Newmont's presentation, an attendee asked for additional insights on Newmont's recently acquired facilities. Rather than disclosing that the Company was unlikely to meet its previous guidance, defendant Viljoen highlighted the

Company's purported efforts to enhance efficiency. In particular, defendant Viljoen stated:

> The flexibility that we can build in our operational performance and how we think about our sustaining capital profile and staging that to ensure that we have a stable ounce profile and a sustainable -- sustainable capital profile.
>
> When we consider the full potential program on the new assets, particularly, we've run all 4 assets that will remain in the portfolio now through our full potential program. And that is -- all of those are in execution at the moment. We have committed $200 million are as part of the synergies that will come from that process, and we're well on track.
>
> But I do want to emphasize that not only through the full potential program, but in stepping back and changing the constraints that we've put on our operations, the constraints that we've put on how we look at our portfolio of assets and how that enterprise have interdependency, it is an opportunity for us to make a real step change in productivity, bringing costs down to sustainable low cost base and working towards that economic margin expansion that Karyn has been talking about.

64. In response to a question inquiring about Newmont's top priorities moving forward, defendant Viljoen once again touted the Company's portfolio and emphasized its purportedly balanced approach towards large-scale projects. In particular, defendant Viljoen stated:

> Lastly, we've got this embarrassment of riches in terms of the broader portfolio. And Karyn and I partnered on this to say, "Well, we want to really make a step change in how we develop and deliver on large-scale projects." Financial evaluation is a really big portion of that development, but really understanding the technical detail and risk or opportunity on the delivery and execution of that projects is the focus. So as we step through this embarrassment of riches, not looking -- only looking at the financial returns, but our ability to committed to deliver and deliver against it. And then we will put that through our capital allocation framework.

65. The statements referenced above were false and misleading when made because they failed to disclose that: (i) the Company was not on track to achieve mining production and cost profile improvements; (ii) as a result, the Company provided inaccurate projections about its growth and business prospects; and (iii) the Company failed to maintain proper internal controls.

**The Truth Emerges**

66. On October 23, 2024, the truth emerged when Newmont issued its press release

announcing its disappointing financial results for the third quarter ended September 30, 2024. The press release revealed that Newmont had lowered its production guidance and reported higher operating costs, just about three months after the Company assured investors it would achieve higher production and reduced costs. In particular, the press release stated:

> Gold CAS totaled $1.9 billion for the quarter. Gold CAS per ounce ***increased 5 percent*** to $1,207 per ounce compared to the prior quarter primarily due to higher direct costs at Lihir, as a result of planned autoclave maintenance, ***as well as higher direct operating costs primarily due to increased contract services across the portfolio***.
>
> Gold AISC per ounce ***increased 3 percent*** to $1,611 per ounce compared to the prior quarter primarily due to higher CAS.
>
> * * *
>
> CAS per GEO ***increased 21 percent*** from the prior quarter to $1,015 per ounce due to higher costs allocated to co-products at Peñasquito, Cadia, and Red Chris, as well as the impact of the shutdown at Telfer due to the tailings remediation work.
>
> AISC per GEO ***increased 11 percent*** to $1,338 per ounce compared to the prior quarter primarily due to higher CAS from other metals, partially offset by lower treatment and refining costs.
>
> Net income attributable to Newmont stockholders was $922 million or $0.80 per diluted share, an increase of $69 million from the prior quarter primarily due to higher average realized gold prices and higher sales volumes, partially offset by higher unit costs of production, as well as a loss on assets held for sale of $115 million recognized in the third quarter compared to $246 million recognized in the second quarter of 2024.

67. That next day, Newmont held an earnings call with analysts and investors to discuss its financial results. During the call, defendant Viljoen disclosed that the Company expected a decline in production levels at its Lihir and Brucejack facilities. In particular, defendant Viljoen stated:

> As we look ahead to 2025, our operational focus at Lihir will remain on reducing complexity to deliver more sustainable and predictable results at this Tier 1 operation. In the short term, ***these efforts will result in lower than initially***

> ***anticipated production next year*** due to lower throughput to allow for asset reliability improvement work and changes to the mine sequencing, including the establishment of wider ramps to manage surface water and repositioning all roads to be more effective and efficient.
>
> Whilst we complete this work, we will be processing a higher proportion of lower grade stockpiles in 2025. And ***we anticipate that gold production next year from Lihir will be largely consistent with this year's and around 250,000 ounces lower than our initial guidance for 2025 that we provided back in February***.
>
> * * *
>
> Similarly, at Brucejack, we have taken a step back this year to do the development and drilling work to ensure that we improve our knowledge of this nuggety ore body. We continue to experience periods of exceptional high grades, including a 1-day average of 52 grams per ton last month and an average of over 20 grams per ton in the same week. As a result of the work we are doing, we anticipate that the gold production next year from Brucejack will also be largely consistent with this year, ***all around 100,000 ounces lower than our initial guidance for 2025 that we provided back in February***.

68. Later in the call, defendant Palmer confirmed that the Company expected lower production from two of its Tier 1 facilities. Defendant Palmer also disclosed that Newmont continued to face increased costs. In particular, defendant Palmer stated:

> Looking ahead to 2025, we expect gold production from our go-forward Tier 1 portfolio to remain largely consistent with this year, ***driven by the lower than previously expected production from two of our new operations in Lihir and Brucejack***. We expect unit costs for our core portfolio in 2025 to align with the trends we are observing this year. We also remain committed to the critical tailings work in Cadia, which may result in an annual sustaining capital spend of around $1.8 billion from our core portfolio over the next few years.
>
> And ***we continue to see higher previously expected direct costs and G&A spend***. But with the clarity of our go-forward portfolio, we are now working to manage. With this context, my leadership team and I have a laser focus on the work we need to do to optimize our go-forward portfolio of 11 managed operations and 3 projects in execution. Whilst we do anticipate production growth over time, our focus is firmly on expanding margins, generating a strong return on capital invested and creating value versus chasing volume. We are taking a critical look at our organic project pipeline and spending time to ensure that any reinvestment we make into our portfolio is both disciplined and deliberate.

69. During the question-and-answer portion of the call, an analyst questioned whether Newmont's cost reduction expectations were realistic given the Company's revised guidance. In particular, defendants Palmer and Ovelmen responded:

> [Defendant Palmer:] Certainly, if I think about the gold industry, there's always been a strong correlation between gold price and the cost of producing an ounce of gold, given that inflation is one of those key structural elements behind the gold price. So as you look forward, if gold price eases, then you'd expect the cost of producing an ounce to ease. And obviously, you're going to see some tracking between the cost per ounce and the gold price. Our focus is on what we're putting in place is that we have 11 managed operations going forward where we're going to be in a position to be looking over the long term and strengthening and growing those margins.
>
> The other comment I'd make before I pass to Karyn, if you wanted to build on that, is when you look at the out-year numbers that we had provided back in February, that assumed 0 escalation. And so when you think about any forward-looking numbers, there's no escalation. And obviously, what we're seeing as we are closer to 2025, the run rates we're seeing as we close out this year and that is going to flow into next year as we understand the cost for the next 12 to 15 months.
>
> [Defendant Ovelmen:] Generally speaking, as we indicated, the cost that we're seeing here in 2024, we do expect those to trend into 2025. Costs were higher, driven by higher direct costs, primarily. If you think about contracted labor, which is 50% of our cost structure, we've seen those increase into the third quarter and through the year. And so we expect that, that's been built in now into our cost estimates as we head into 2025.

70. Next, the analyst asked a follow-up question concerning how the Company's recent findings would impact its 2025 guidance. In particular, defendant Palmer responded:

> Certainly, the two movers in terms of our managed portfolio, and as I think as Natascha said in her remarks, and I followed up with the drivers behind that mine sequence at Lihir and getting in front of understanding the resource definition of Brucejack and the development work and the drilling you need to do for that. Both of those are progressing well, but it's the ounces for next year reflect that important work. I think the numbers, if you then look at the rest of the portfolio on those trends coming through from '24 flowing into '25 the number is more like 5.6 as you think about this portfolio for 2025, the core portfolio of the 2025. Obviously, we've got some divestments to close out and still got some more work to do on that front.

71. Another analyst sought clarification on the revised guidance, emphasizing the

significance of the change compared to what the Individual Defendants had represented to investors in previous disclosures. In particular, defendants Palmer and Ovelmen responded:

> [Defendant Palmer:] So maybe pick it up in a few parts. I think the commentary around Lihir, Cadia, Cerro Negro, I think you mentioned, is really the Q3 cost story. So it's around Lihir, we had some costs that we had assumed would be in the fourth quarter for the large autoclave shutdown specialist labor in the remote part of the world moving into Q3. So that's one of the drivers there.
>
> Cadia was power, where a higher power cost coming off our contract for price taker. Cerro Negro, it was more around ramping up following the tragedy earlier this year and making sure we're focused on doing that work safely, some productivity impacts. And then the other factor in the third quarter was we had some concentrate sales at Peñasquito didn't get away at the end of the third quarter due to some weather impacts there that obviously flowed into the fourth quarter.
>
> So that's sort of bit of a ramp up of the third quarter cost story. When I look at '24 flowing into '25, so there's two impacts, the volume impact we just talked about with Dan and the Lihir and Brucejack work next year linked to that. And then the cost impact is sustaining capital and particularly around the work we're putting into the tailings facilities at Cadia. Cadia has got a 30-plus year life, several Panel Caves from come on. And there's work we need to do to ensure that Telfer capacity is matched to the volumes coming out of those Panel Caves. So that story is around volume for those couple of key drivers and then sustaining capital.
>
> [Defendant Ovelmen:] Just a little more granularity in terms of 2024. So about 1/3 of that is increased due to that lower sales volume, including impacts from Telfer, Lihir and Brucejack. Another 1/3 relates to that higher sustaining capital that we've been talking about largely driven by Nevada. And then the remaining 1/3, half of that is by royalties due to higher gold price and half associated with the G&A. So our run rate synergies are driven by the targeted benefits at Cadia, Red Chris and Lihir. However, we've also had performance challenges within the business, including the Telfer tailings as well as the nonmanagement of underperformed expectations. But -- and I think further to that supply chain, G&A benefits have been impacted by our need to invest in the future of this combined Tier 1 portfolio with a key focus in areas with the integration from Newcrest to new mines as needed. But we're not happy with where we're at, and we're working to reduce these costs.

72. In response to an analyst's question asking whether achieving the Company's synergy target would reduce operating costs, defendant Palmer revealed his dissatisfaction with Newmont's high expenses and emphasized the need for further cost reduction. In particular, defendant Palmer responded:

> Yes, obviously, the G&A component of that is part of your OpEx. The supply chain is a combination between improving costs and opportunity to get to productivity and volume. A lot of the full potential work is around volume. So you get some more productivity with current gold price, you get that benefit flowing through. So probably of the amount of that delivery, it's probably less than half has come from that an operational exit the soft improvements as opposed to the productivity and volume improvements and the free cash flow that you get coming through. And if I look through that, if I look at where we sit is one of the earlier questions, as we're closing out the integration and the important part of closing out the integration is completing our divestments and having a clear line of sight to 11 managed operations, 3 projects in execution.
>
> ***I'm not happy with the G&A that we have that go-forward business. And that's an area that we're going to be focusing on to get that number down to match the go-forward business***. And that's a little bit of that higher cost to carry as you work through that transition. But as we get that clarity on the remaining divestments going out the door, we need to ensure that our G&A is matching the size of the go- forward business and expect to see some -- we'll be working hard to get some improvement in that area in the months ahead.

73. On this news, Newmont's market capitalization plunged 14.7%, or $8.49 per share, on October 24, 2024, to close at $49.25 per share compared to the previous trading day's closing of $57.74 per share, erasing over $9.6 billion in market capitalization in a single day.

## DAMAGES TO NEWMONT

74. As a a result of the Individual Defendants' improprieties, Newmont disseminated improper, public statements concerning Newmont's inability to deliver increased gold production, while lowering overall costs at its Tier 1 facilities. From the time the Individual Defendants made their improper statements until the truth emerged, their actions severely damaged Newmont's credibility, resulting in a market capitalization loss of nearly $30.1 billion,

or 84.6%.

75. Newmont's performance issues also damaged its reputation within the business community and in the capital markets. In addition to price, Newmont's current and potential customers consider a Newmont's ability to accurately value its business prospects and evaluate growth potential. Investors are less likely to invest in companies that are uncertain about their own financial conditions and fail to disclose material information in a timely manner. Additionally, Newmont's ability to raise equity capital or debt on favorable terms in the future is now impaired. Furthermore, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

76. Further, as a direct and proximate result of the Individual Defendants' actions, Newmont has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to (a) costs incurred from investigating and defending Newmont and certain officers and directors in the Securities Class Action for violations of federal securities laws; (b) costs expended to correct the Company's inadequate internal controls over financial reporting; and (c) costs incurred from compensation and benefits paid to the defendants who have breached their duties to Newmont.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

77. Plaintiff brings this action derivatively in the right and for the benefit of Newmont to redress injuries suffered, and to be suffered, by Newmont as a direct result of breaches of fiduciary duty and unjust enrichment by the Individual Defendants. Newmont is named as a nominal defendant solely in a derivative capacity.

78. Plaintiff will adequately and fairly represent the interests of Newmont in enforcing and prosecuting its rights.

79. Plaintiff was a stockholder of Newmont at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Newmont stockholder.

80. The current Board of Newmont consists of the following twelve individuals: defendants Palmer, Boyce, Brook, Nelson, Quintana, Médori, Clark, Madero, FitzGerald, Layman, and non-defendants Harry M. Conger IV and David Seaton. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because A Majority Of The Board Faces A Substantial Likelihood Of Liability For Their Misconduct**

81. As alleged above, defendants Palmer, Boyce, Brook, Nelson, Quintana, Médori, Clark, Madero, FitzGerald, and Layman breached their fiduciary duties of loyalty by making or causing Newmont to make improper statements in the Company's press releases and public filings regarding its growth and business prospects. As such, ten of the twelve members of the current Board are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for misconduct alleged herein.

82. The Director Defendants either knew, or should have known, of the materially false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

83. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the

Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

84. Each of the Director Defendants authorized and/or permitted false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

85. Defendants Brook, Médori, and Clark, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance. The Audit Committee's Charter provides that it is responsible for financial and other reporting and internal controls. Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and disclosure controls. Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein. Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

86. Any suit by the current directors of Newmont to remedy these wrongs would expose defendant Palmer and Newmont to liability for violations of the federal securities laws in the pending Securities Class Action. The Securities Class Action alleges violations of sections 10(b) and 20(a) of the Exchange Act. If the Board elects for the Company to press forward with its right of action against defendant Palmer in this action, then Newmont's efforts would

compromise its defense of the Securities Class Action.

87. The principal professional occupation of defendant Palmer is his employment with Newmont, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above. Accordingly, defendant Palmer lacks independence from defendants Boyce, Brook, Nelson, Quintana, Médori, Clark, Madero, FitzGerald, and Layman due to his interest in maintaining his executive position at Newmont. This lack of independence renders defendant Palmer incapable of impartially considering a demand to commence and vigorously prosecute this action. Accordingly, defendant Palmer is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Demand is futile as to defendant Palmer.

**COUNT I**
**Breach of Fiduciary Duty Against the Individual Defendants**

88. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

89. The Individual Defendants owed and owe Newmont fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Newmont the highest obligation of care and loyalty.

90. The Individual Defendants and each of them, violated and breached their fiduciary duties.

91. The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the misconduct of such substantial magnitude and duration. The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing Newmont was

releasing materially false and misleading information to the public. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

92. The Director Defendants, as directors of the Company, owed Newmont the highest duty of loyalty. These defendants breached their duty of loyalty through their failure to: (i) provide truthful and accurate statements regarding Newmont's ability to achieve mining and cost profile improvements at its Tier 1 facilities; and (ii) maintain adequate internal controls. Accordingly, these defendants breached their duty of loyalty to the Company.

93. The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, as required by the Audit Committee Charter in effect at the time.

94. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Newmont has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

95. Plaintiff, on behalf of Newmont, has no adequate remedy at law.

**COUNT II**
**Contribution Under Sections 10(b) and 21D of the Exchange Act**
**Against the Individual Defendants**

96. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

97. The Company and Individual Defendants are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the

Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Individual Defendants' willful and/or reckless violations of their obligations as controlling shareholder, officers, and/or directors of Newmont.

98. Individual Defendants, because of their positions of control and authority, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Newmont, including the wrongful acts complained of herein and in the Securities Class Action.

99. Accordingly, Individual Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

100. As such, Newmont is entitled to receive all appropriate contribution or indemnification from Individual Defendants.

**COUNT III**
**Unjust Enrichment Against the Individual Defendants**

101. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

102. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Newmont. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Newmont.

103. Plaintiff, as a stockholder and representative of Newmont, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their

wrongful conduct and fiduciary breaches.

104. Plaintiff, on behalf of Newmont, has no adequate remedy at law.

**COUNT III**
**Waste of Corporate Assets Against the Individual Defendants**

105. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

106. The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of the Company's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

107. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (a) paying and collecting excessive compensation and bonuses; and (b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

108. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

109. Plaintiff on behalf of Newmont has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of Newmont, demands judgment as follows:

A. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties and unjust enrichment;

B. Directing Newmont to take all necessary actions to reform and improve its

corporate governance and internal procedures to comply with applicable laws and to protect Newmont and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1. a proposal to strengthen the Company's controls over financial reporting;

2. a proposal to strengthen the Company's internal controls to verify the accuracy of its mining production levels;

3. a proposal to strengthen Newmont's oversight of its disclosure procedures;

4. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the

5. a provision to permit the stockholders of Newmont to nominate at least three candidates for election to the Board;

C. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Newmont has an effective remedy;

D. Awarding to Newmont restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants,

E. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: May 9, 2025

**COOCH AND TAYLOR P.A.**

*/s/ Blake A. Bennett*
Blake A. Bennett (Bar ID 5133)
1000 N. West Street, Suite 1500
Wilmington, DE 19801
(302) 984-3889
bbennett@coochtaylor.com

*Attorneys for Plaintiff George Willis, as Trustee of the George and Kathleen Willis Trust*

Of Counsel:

**MORRIS KANDINOV LLP**
Leonid Kandinov
Andrew Robertson
550 West B Street, 4th Floor
San Diego, CA 92101
(877) 216-1552
leo@moka.law
andrew@moka.law